IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

Jose CRESPO CAGNANT,
an individual

     Plaintiff,

v.

UNITED STATES,

     Defendant.

_____/

## **COMPLAINT**

  Plaintiff, Jose Crespo Cagnant (Mr. Crespo or Plaintiff), by and through his undersigned counsel, hereby sues Defendant, the United States of America, and alleges the following:

## **PRELIMINARY STATEMENT**

  1. This case involves the extraordinary misconduct of agents of U.S. Customs and Border Protection (CBP) who unlawfully prevented Mr. Crespo from pursuing relief from deportation to which he was legally entitled, falsified documents to support their illegal actions, and, as found by Judge Ursula Ungaro, sitting in this Court, did not testify credibly regarding Mr. Crespo's deportation. As a result of their conduct, Mr. Crespo was improperly removed from the United States and was prosecuted for a federal criminal offense without legal basis. He brings this action under the Federal Tort Claims Act (FTCA) to seek compensation for the harms and losses he suffered.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this Complaint. 28 U.S.C. §
1346(b) (United States as defendant).

3.      On June 20, 2017, Plaintiff submitted an Administrative Tort Claim to the
Department of Homeland Security (DHS) and CBP. CBP denied the claim on December 8, 2017.
Plaintiff is filing this Complaint within six months of the denial of his administrative claim, in
accordance with the FTCA. 28 U.S.C. §§ 2675(a), 2401(b).

4.      Venue is proper in this District under 28 U.S.C. § 1402(b), as Plaintiff resides in
Miami, Florida.

## PARTIES

5.      Plaintiff Jose Crespo Cagnant is a resident of Miami, Florida.

6.      Defendant United States of America is the appropriate defendant for claims
brought under the FTCA. 28 U.S.C. § 1346(b).

7.      All federal officers identified below were acting within the scope and course of
their employment with the United States and were acting as law enforcement officers.

## LEGAL BACKGROUND

8.      This case involves two summary removal processes that are briefly outlined in this
section.

9.      First, through a process called "expedited removal," DHS may summarily deport
certain noncitizens arriving with false or improper documents from the United States without any
hearing before an immigration judge, unless the person expresses an intention to apply for asylum
or a fear of persecution. *See* 8 U.S.C. § 1225(b)(1).

10.     To ensure that people are not unlawfully denied the opportunity to apply for

asylum, the controlling regulations require DHS to provide noncitizens in the expedited removal process with an advisal of their right to speak to an asylum officer if they have a fear of returning to their country of origin. *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring reading of Form I-867A).

11.     If an individual indicates to a DHS officer that he or she intends to apply for asylum or fears persecution, DHS is obligated to follow binding statutory and regulatory law intended to protect such individuals from improper expedited removal orders that would otherwise strip them of their opportunity to apply for asylum. The DHS officer must refer that individual for an interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4). If the asylum officer determines the fear is credible, the expedited removal order is vacated and DHS places the individual in removal proceedings before an immigration judge, in which proceedings the individual can pursue, inter alia, an asylum claim as a defense to removal. 8 C.F.R. § 208.30(f); *see also* 8 C.F.R. § 1003.42(f). Moreover, even if the asylum officer determines the fear is not credible, the individual is entitled review of that determination by an immigration judge. 8 C.F.R. § 1003.42.

12.     Regardless of whether the individual expresses a fear, DHS officers must follow regulatory procedures. The officer must inform the individual of the charges of inadmissibility against him or her (on Form I-860) and provide an opportunity to respond to those charges. *See* 8 C.F.R. § 235.3(b)(2)(i). When it is necessary, the officer must use an interpreter to communicate with the individual. *See id.* The officer must create a record of the facts of the case and the individual's statements, read all the information in the record back to the individual, and allow for corrections. *See id*. A supervisor—also a DHS officer—must review and sign the expedited removal order before it becomes final. *See* 8 C.F.R. § 235.3(b)(7).

13.     Second, through a process called "reinstatement of removal," DHS may summarily deport individuals who reenter the United States unlawfully after having departed under a prior removal order without any hearing before an immigration judge unless the individual expresses a fear of returning to his or her country of origin. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. §§ 241.8, 208.31.

14.     Similar to the requirements for expedited removal, if a person indicates a fear of return, DHS must refer that individual for an interview with an asylum officer. *See* 8 C.F.R. §§ 241.8(e), 208.31. If the asylum officer determines the fear is reasonable, the person is referred to an immigration judge to apply for withholding of removal or protection under the United Nations Convention Against Torture. *See* 8 C.F.R. §§ 208.31(e), 1208.31(e), 208.2(c)(2), 1208.2(c)(2), 1208.16. If the judge denies protection, the person can appeal to the Board of Immigration Appeals and, ultimately, to the appropriate court of appeals. *See* 8 C.F.R. § 208.31(e); 8 U.S.C. § 1252(a). If the asylum officer determines the fear is not reasonable, the individual nonetheless is entitled to further review of that determination by an immigration judge and, ultimately, the appropriate court of appeals. *See* 8 C.F.R. §§ 208.31(f), (g), 1208.31(f), (g); *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1308 (11th Cir. 2016).

## FACTUAL ALLEGATIONS

15.     Mr. Crespo was born in Mexico in 1979.

16.     While growing up in Mexico, Mr. Crespo suffered threats, violence, discrimination, and mistreatment because of his sexual orientation by his family and community, including by police and individuals with connections to the police.

17.     In January 2002, he met Alan Wurts, a U.S. citizen to whom he is now married, in Mexico. When Mr. Crespo's family and community learned of their relationship, Mr. Crespo was

4

fired from his job and threatened due to his sexual orientation. Then, he was attacked and gagged by two men while a third man pointed a gun to his head. The police came and interrupted the attack but told Mr. Crespo he had to leave immediately if he valued his life. Mr. Crespo went into hiding and began looking for a way to leave Mexico immediately.

18.     As a result, on June 15, 2002, he fled and attempted to enter the United States, but was turned away by CBP.

19.     No more than a month later, Mr. Crespo entered the United States.

20.     In March 2004, Mr. Crespo returned to Mexico to attend his father's funeral. His mother had previously passed away in May 2000.

21.     In April 2004, he applied for and received a border crossing card (BCC). He did not disclose his 2002 attempted entry on that application. A BCC is a B1/B2 visitor's visa issued to Mexican citizens that permits entry into the United States until the date of expiration on the card. Mr. Crespo's BCC was valid until April 18, 2014.

22.     He subsequently entered the United States using the BCC.

23.     Thereafter, in September 2004, he applied with U.S. Citizenship and Immigration Services (USCIS) to change to student status to study at Miami Dade College. He did not disclose his 2002 attempted entry on that application.

24.     In May 2005, Mr. Crespo traveled to the U.S. Embassy in Mexico and was issued a student visa. He returned to the United States and lived in lawful status.

25.     In 2009, Mr. Crespo applied to change his immigration status from a student to a TN-2 nonimmigrant based on his employment at a restaurant. He did not disclose his 2002 attempted entry on that application.

26.     The TN-2 nonimmigrant category is available to Mexican citizens who are business

professionals in certain occupations. If eligible, a Mexican citizen may apply to USCIS to change status in the United States to the TN-2 nonimmigrant category.

27.     USCIS approved his application to change to TN-2 status in August 2009. This allowed him to continue to live and work lawfully in the United States.

28.     In October 2011, Mr. Crespo traveled to Mexico because his attorney told him to go to the U.S. Embassy to obtain the TN-2 visa in his passport.

29.     While in Mexico, on or about October 13, 2011, Mr. Crespo went to the U.S. Embassy to obtain a TN-2 nonimmigrant visa in his passport. Mr. Crespo expected that he would receive this visa based on his previously approved application to change from student to TN-2 status.

30.     The U.S. Embassy, however, informed Mr. Crespo that his employment did not qualify for TN-2 status and took away his prior BCC. The Embassy employee said they would call Mr. Crespo about his BCC. Mr. Crespo believed it would be returned to him, but it was not.

*2012 Expedited Removal Order*

31.     Mr. Crespo remained in Mexico in hiding. He stayed with the family of his partner (now husband), Mr. Wurts, and was constantly afraid of what might happen to him if he left the house.

32.     Desperate to return to Mr. Wurts, who was in poor health, on or about January 14, 2012, Mr. Crespo entered the United States near Hidalgo, Texas.

33.     Mr. Crespo carried with him a valid Florida driver's license.

34.     Later that day, CBP officers apprehended him and brought him to the Welasco, Texas Border Patrol Station.

35.     CBP officers placed him in an extremely cold and crowded holding cell for several

hours, without blankets, warm clothing, food, or water.

36.     Mr. Crespo was suffering from an asthma attack and fever.

37.     Thereafter, CBP Officer Brenton Reveruzzi interviewed Mr. Crespo in a large room.

38.     During the interview, Mr. Crespo continued to exhibit symptoms of an asthma attack, including shortness of breath and a cough, and a fever.

39.     Because Mr. Crespo was exhibiting these symptoms, Officer Reveruzzi handed Mr. Crespo a face mask and indicated to put it over his mouth.

40.     Officer Reveruzzi interviewed Mr. Crespo in English.

41.     Mr. Crespo understood and spoke little English at that time.

42.     Mr. Crespo spoke to Officer Reveruzzi in Spanish.

43.     At no point during the interview did Officer Reveruzzi request the assistance of an interpreter or of any other officer.

44.     At the time he conducted this interview, Officer Reveruzzi's only formal training in Spanish was an 8-week course provided to CBP officers.

45.     Officer Reveruzzi did not ask Mr. Crespo in any way that Mr. Crespo could understand, whether he was afraid to return to Mexico.

46.     Officer Reveruzzi did not refer Mr. Crespo to an asylum officer for a credible fear interview.

47.     Instead, Officer Reveruzzi completed the documentation necessary to issue an expedited removal order against Mr. Crespo.

48.     These documents included a Record of Deportable/Inadmissible Alien (Form I-213), Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act (Form I-

867A), and Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act (Form I-867B).

49.     On the Record of Deportable/Inadmissible Alien (Form I-213), Officer Reveruzzi wrote that Mr. Crespo stated that he did not have a fear of returning to Mexico.

50.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo if he had a fear in any way that he could understand.

51.     On Form I-213, Officer Reveruzzi wrote that he had advised Mr. Crespo using Form I-867A in Spanish and that Border Patrol Agent Daniel Garcia had witnessed the advisal. He wrote that Mr. Crespo stated that he understood his rights.

52.     These statements were false. Officer Reveruzzi did not advise Mr. Crespo of his rights in any way that he could understand, and Mr. Crespo did not state that he understood his rights.

53.     On Form I-213, Officer Reveruzzi wrote that Mr. Crespo stated that he was entering the United States to live and work in McAllen, Texas.

54.     This statement was false. Mr. Crespo's home and partner were in Miami, Florida. He entered the United States because he feared persecution in Mexico.

55.     On Form I-213, Officer Reveruzzi wrote that Mr. Crespo appeared to be in good health and claimed to be healthy.

56.     This statement was false. Mr. Crespo was suffering from a fever and asthma.

57.     On Form I-213, Officer Reveruzzi wrote that Mr. Crespo's mother and father lived in Veracruz, Mexico.

58.     This statement was false. At the time, Mr. Crespo's parents were deceased and had been deceased for several years.

8

59.     Form I-213 was completed and signed by Officer Reveruzzi.

60.     Examining Officer Jose J. Olivares also signed Form I-213.

61.     Officer Olivares did not ask Mr. Crespo in any way that he could understand if he was afraid of returning to Mexico.

62.     Officer Olivares did not arrange for a Spanish language interpreter for Mr. Crespo.

63.     On the Record the of Sworn Statement in Proceedings under Section 235(b)(1) of the Act (Form I-867A), Officer Reveruzzi wrote that Mr. Crespo stated that he did not have a fear of returning to Mexico.

64.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand if he had a fear, and Mr. Crespo did not state that he had no fear of returning to Mexico.

65.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo stated that he entered the United States to live and work in McAllen, Texas for a few years.

66.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand why he had entered the United States, and Mr. Crespo did not state that he entered the United States to live and work in McAllen, Texas.

67.     Mr. Crespo entered the United States because he feared persecution in Mexico and because his home and partner were in Miami, Florida.

68.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo stated that he had never previously lived in the United States.

69.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand whether he previously lived in the United States, and Mr. Crespo never stated that he had never lived in the United States because he had, in fact, previously lived in the United

States.

70.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo stated that his parents live in Mexico.

71.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand where his parents lived, and Mr. Crespo did not state that his parents lived in Mexico as, at the time, Mr. Crespo's parents were deceased.

72.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo stated that he understood the I-867A advisal and had no questions.

73.     This statement was false. Mr. Crespo did not understand the I-867A advisal.

74.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo only stated that he had a Mexican voter registration card as identification.

75.     This statement was false. Mr. Crespo had a valid Florida driver's license.

76.     On Form I-867A, Officer Reveruzzi wrote that Mr. Crespo's statement was made to him, in Spanish, without any interpreter.

77.     On the Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act (Form I-867B), Officer Reveruzzi wrote that Mr. Crespo stated that he did not have any fear or concern about returning to Mexico.

78.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand if he had a fear, and Mr. Crespo did not state that he did not have a fear or concern about returning to Mexico.

79.     On Form I-867B, Officer Reveruzzi wrote that Mr. Crespo stated that he would not be harmed if he was returned to Mexico.

80.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that

he could understand if he would be harmed if returned to Mexico, and Mr. Crespo did not state that he would not be harmed if he returned to Mexico.

81.     On Form I-867B, Officer Reveruzzi wrote that Mr. Crespo stated that he left Mexico to live and work in McAllen, Texas.

82.     This statement was false. Officer Reveruzzi did not ask Mr. Crespo in any way that he could understand why he left Mexico, and Mr. Crespo did not state that he left Mexico to live and work in McAllen, Texas.

83.     Mr. Crespo entered the United States because he feared persecution in Mexico and because his home and partner were in Miami, Florida.

84.     Form I-867B indicated that it was witnessed by Officer Daniel Garcia.

85.     Officer Garcia did not read Form I-867B to Mr. Crespo.

86.     Officer Garcia did not ask Mr. Crespo in any way that he could understand whether he had a fear of returning to Mexico.

87.     Officer Garcia did not arrange for a Spanish language interpreter for Mr. Crespo.

88.     Officer Reveruzzi did not read either Form I-867A or I-867B aloud to Mr. Crespo in Spanish or any other way that he could understand.

89.     No officer provided Mr. Crespo with a meaningful opportunity to review or make corrections to Form I-213, Form I-867A, or Form I-867B.

90.     Officer Reveruzzi also completed a Notice and Order of Expedited Removal (Form I-860).

91.     The Notice portion of Form I-860 charged Mr. Crespo with inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for lacking valid entry documentation.

92.     Acting Patrol Agent in Charge James B. Moseley signed the order portion of Form

I-860. Officer Moseley did not ask Mr. Crespo if he was afraid of returning to Mexico.

93.     With respect to the Notice portion of Form I-860, neither Officer Reverruzzi nor Officer Moseley read the charges to Mr. Crespo in Spanish, nor offered him a meaningful opportunity to respond to those charges. Nor did they ask a Spanish-speaking officer to read the charges to Mr. Crespo.

94.     The Order portion of Form I-860 ordered Mr. Crespo removed pursuant to 8 U.S.C. § 1225(b)(1).

95.     After Officer Reveruzzi completed the forms, he gestured for Mr. Crespo to sign in several places.

96.     Mr. Crespo did not understand what he was signing, and Officer Reveruzzi did not explain the forms in any way that Mr. Crespo could understand.

97.     After completion of the expedited removal paperwork containing the numerous falsehoods outlined above, CBP moved Mr. Crespo to another location with another extremely cold and crowded cell, without food, water, or warm clothing. In these conditions, his cough and fever worsened.

98.     Mr. Crespo was moved to other locations over the next few days.

99.     After approximately 5 days in immigration detention, CBP deported Mr. Crespo to Mexico on or about January 19, 2012, based on the expedited removal order.

***2012 Reinstatement Order and Return to the United States***

100.    Upon his removal to Mexico, Mr. Crespo feared remaining there and was desperate to reunite with his partner, Mr. Wurts, in Miami.

101.    On or about February 6, 2012, Mr. Crespo reentered the United States near Hidalgo, Texas.

102.     On or about February 6, 2012, CBP officers raided the house where Mr. Crespo was temporarily staying and arrested him.

103.     On or about February 7, 2012, CBP Officer Victor Vela interviewed Mr. Crespo.

104.     CBP officers, including Officer Vela, prepared paperwork for a second summary removal process, known as reinstatement or removal, under 8 U.S.C. § 1231(a)(5).

105.     This paper work included a Record of Deportable/Inadmissible Alien (Form I-213) and Record of Sworn Statement (Form I-215B).

106.     CBP relied on the January 2012 expedited removal order, which contained the numerous falsehoods outlined above, as the factual predicate for initiating the reinstatement process under Section 1231(a)(5).

107.     Officer Vela spoke Spanish to Mr. Crespo. Mr. Crespo was able to communicate with him. As he was required to do, Officer Vela asked Mr. Crespo if he was afraid of returning to Mexico.

108.     Mr. Crespo responded that he was afraid. He explained that he was afraid due to his sexual orientation and that he did not believe he would be safe in Mexico.

109.     Officer Vela did not then, or at any time thereafter, refer Mr. Crespo to an asylum officer to assess whether his fear was reasonable.

110.     Instead, Officer Vela informed Mr. Crespo that he had no chance of getting asylum or being allowed to stay in the United States.

111.     Furthermore, Officer Vela told Mr. Crespo that he would be detained for a long period of time if he attempted to fight his case.

112.     Officer Vela told Mr. Crespo to think about not fighting his case and instead accept voluntary departure. A noncitizen may be issued a voluntary departure order in lieu of a removal

order.

113.    These statements were false and misleading. Officer Vela did not process Mr. Crespo for a voluntary departure order. Instead, CBP issued a reinstatement order.

114.    Mr. Crespo was entitled to present his fear claim to an asylum officer. Asylum officers specialize in assessing protection claims. Officer Vela had no specialized knowledge of protection-based claims. Nor was Officer Vela in a position to assess the potential length of detention Mr. Crespo would endure because any such detention would be the responsibility of U.S. Immigration and Customs Enforcement, not CBP. Finally, it is well established that fear of persecution based on sexual orientation provides a basis for protection from removal. *See, e.g.*, *Ayala v. U.S. Att'y. Gen.*, 605 F.3d 941, 949 (11th Cir. 2010).

115.    Mr. Crespo believed he had no other option but to accept deportation.

116.    On Form I-213, a CBP officer wrote that Mr. Crespo was not afraid to return to Mexico. This was false.

117.    On Form I-215B, Officer Vela wrote that Mr. Crespo stated that he was not afraid to return to Mexico. This was false.

118.    On Form I-213, a CBP officer wrote that Mr. Crespo entered the United States to work in Houston. The form contains an incorrect address.

119.    These statements are false. Mr. Crespo entered the United States because he feared persecution in Mexico and because his home and partner were in Miami, Florida.

120.    Form I-215B indicates that it was witnessed by Acting Border Patrol Agent in Charge Rene A. Rodriguez.

121.    Officer Vela also completed a Notice of Intent/Decision to Reinstate Prior (Form I-871).

14

122.    The Decision portion of Form I-871 ordered Mr. Crespo removed pursuant to 8 U.S.C. § 1231(a)(5).

123.    Acting Patrol Agent in Charge Rodriguez signed the order portion of Form I-871.

124.    After approximately five days in immigration detention, CBP deported Mr. Crespo to Mexico on or about February 11, 2012.

125.    Still fearful of remaining in Mexico, Mr. Crespo once again attempted to enter, and did in fact enter, the United States in March 2012.

126.    Mr. Crespo returned to his partner, Alan Wurts, in Miami, Florida.

127.    Mr. Crespo and Mr. Wurts married on August 6, 2013.

128.    Mr. Wurts is a U.S. citizen.

129.    Following his marriage, Mr. Crespo, with the assistance of counsel, sought to legalize his immigration status by filing an immediate relative visa petition (Form I-130) and application to adjust status to that of a lawful permanent resident (I-485).

130.    On or about April 13, 2015, Mr. Wurtz and Mr. Crespo attended an interview at USCIS on the immediate relative visa petition (Form I-130). USCIS approved the petition that same day.

### Home Raid and Dismissed Criminal Charges

131.    Early in the morning on July 28, 2015, several law enforcement officers came to Mr. Crespo and Mr. Wurts' home.

132.    The officers were armed with guns. They banged on the door and entered the home. The officers shouted at Mr. Crespo and Mr. Wurts who had just awoke and were still in boxers. One officer raised his gun and pointed it at Mr. Wurts and then Mr. Crespo. The officers forced Mr. Crespo and Mr. Wurts into the street in front of their home without allowing them to put on

clothes.

133.   Officers handcuffed Mr. Crespo and arrested him in front of his neighbors.

134.   The U.S. Attorneys' Office for the Southern District of Florida charged Mr. Crespo under 8 U.S.C. § 1326 for unlawfully reentering the United States after deportation.

135.   On July 31, 2015, the Court set bail, but neither Mr. Crespo nor Mr. Wurts could afford to post the amount set.

136.   The U.S. Attorneys' Office for the Southern District of Florida relied on the 2012 expedited removal order for the basis of that charge.

137.   Through counsel, Mr. Crespo moved to dismiss the indictment in September 2015.

138.   The Court held a hearing on the motion in October 2015 during which both Mr. Crespo and Officer Reveruzzi testified.

139.   Mr. Crespo testified about what had happened to him while in Defendant's custody in January 2012 and February 2012. Part of his testimony also addressed what he told the consular officer at the U.S. Embassy in Mexico in October 2011.

140.   Officer Reveruzzi also testified. He admitted his Spanish language ability and training were both limited. He stated that he could ask the questions necessary for reports and "basic survival Spanish." He admitted his only formal training was the eight-week Border Patrol Spanish course. He stated that he was unable to translate passages from expedited removal forms into Spanish and did not know how to ask someone if he or she had a B1/B2 visa in Spanish. He testified that he relied upon a Spanish language script to provide information to individuals appearing before him and that he routinely had to ask for assistance from other officers to communicate in Spanish.

141.   Officer Reveruzzi testified that if individuals seeking entry to the United States

16

express fear of returning to their home countries, he requires them to explain exactly what they feel and why. He testified that if, after his further questioning, they "still feel that they need to continue the process," he refers the individuals to a supervisor.

142.    Officer Reveruzzi also testified that he could understand information that the individuals appearing before him provided in Spanish and simultaneously translate the information into English as he typed it into a Word document.

143.    Officer Reveruzzi could not recall from memory the specifics of his 2012 interaction with Mr. Crespo. At different times, he stated that Mr. Crespo did not have any identification on him during the arrest, that Mr. Crespo only had a Mexican voter registration card as identification, and that he did not know if Mr. Crespo had various types of identification with him. At different times, he stated that Mr. Crespo had or had not stated during the 2012 interaction that he previously lived in the United States. Additionally, although he claimed to have read the questions on the Sworn Statement and other preproduced materials to Mr. Crespo using a Spanish language template, he could not recall whether he read the questions only, or if he also read back Mr. Crespo's responses.

144.    Officer Reveruzzi testified in part based on the information contained in the paperwork he prepared in 2012. On that basis, he claimed that Mr. Crespo provided him with various pieces of information during the expedited removal process including that: (a) Mr. Crespo was not afraid of returning to Mexico, (b) he did not claim to have a valid visa, and (c) he was in good health during the interview. Officer Reveruzzi also testified that he had not asked Mr. Crespo if he had a house in the United States.

145.    After the hearing concluded, after three months of detention, Mr. Crespo was released from criminal custody.

146.     In a decision dated November 13, 2015, the Court granted Mr. Crespo's motion to dismiss and dismissed the charge against him.

147.     The Court found Mr. Crespo's testimony credible.

148.     The Court expressly rejected the credibility of portions of Officer Reveruzzi's testimony. The Court refused to credit Officer Reveruzzi's testimony that he was proficient in Spanish, that he had the ability to record information given to him in Spanish into forms, and that he could understand Mr. Crespo's statements about his fear of return to Mexico. The Court also rejected Officer Reveruzzi's testimony that he meaningfully explained the charges to Mr. Crespo or read him the record of their conversation.

149.     As a result, the Court found that the 2012 expedited removal order was fundamentally unfair and invalid for the purposes of the criminal prosecution.

150.     As a result of the proceedings in this Court concerning his criminal prosecution, Mr. Crespo learned for the first time that Officer Reveruzzi and other CBP officers had harmed him by, among other things, causing his unlawful expedited removal by falsifying and fabricating information in the paperwork used to support that removal in January 2012.

### Office of the Inspector General Investigation

151.     On or about August 18, 2016, the DHS Office of the Inspector General (OIG) opened an investigation into Officer Reveruzzi's actions in Mr. Crespo's case. The report that OIG issued at the end of the investigation addressed, among other things, whether Officer Reveruzzi's testimony could be used in support of future removal proceedings and/or criminal prosecutions.

152.     On August 25, 2017, DHS OIG issued a report concluding, contrary to the findings made by this Court, that Officer Reveruzzi did not make false entries on Mr. Crespo's expedited removal paperwork. The report criticized this Court's credibility findings, Crespo's fear of return

and his English language ability and, in part, blamed the outcome of the criminal prosecution on the failure of the assigned Assistant U.S. Attorney to properly prepare Officer Reveruzzi for his testimony. The report makes no mention of the numerous other false entries in Mr. Crespo's paperwork.

153.    As a result of these findings, CBP has taken no disciplinary action regarding Officer Reveruzzi's false and fabricated reports and false testimony. In light of those findings, Officer Reveruzzi may be called to testify as a witness in support of future removal proceedings and/or criminal prosecutions.

*   *   *   *   *

154.    Defendant's actions during the expedited removal, reinstatement, and criminal reentry prosecution proceedings were the proximate cause of considerable emotional, physical, and mental distress to Mr. Crespo. The harm Mr. Crespo suffered was a reasonably foreseeable consequence of Defendant's actions.

155.    Mr. Crespo suffered anxiety, stress, humiliation, and respiratory distress. He also faced loss of liberty on several occasions. Mr. Crespo remains afraid that Defendant's officers will once again come to his home, detain him, and deport him away from his husband and his community, to a country where he fears persecution.

156.    Defendant the United States is liable for these acts and omissions under the FTCA.

## CAUSES OF ACTION

### Count 1
### (Federal Tort Claims Act - Negligence)

157.    The CBP employees referenced above owed a legal duty to Mr. Crespo, breached their duty, and, as such, were a direct and proximate cause and a substantial factor in bringing about Mr. Crespo's damages outlined above.

158.    In particular, during the expedited removal process, the CBP employees referenced above violated their duty to Mr. Crespo by, inter alia, failing to afford Mr. Crespo an opportunity to present his fear-based claim and falsifying documents to support removal orders against him. And, during the reinstatement process, the CBP employees referenced above violated their duty to Mr. Crespo by, inter alia, failing to refer Mr. Crespo, who expressed a fear of return to Mexico, to an asylum officer for a reasonable fear interview and dissuading him from pursuing a protection claim, including through false or misleading statements.

159.    CBP employee's actions constituted the tort of negligence under the laws of the State of Texas.

160.    Under the FTCA, Defendant United States of America is liable for these actions.

### Count 2
### (Federal Tort Claims Act – Abuse of Process)

161.    After initiating the expedited removal process, the CBP employees referenced above perverted use of that process, including by failing to follow binding statutes and regulations in carrying out that process, fabricating evidence to support the expedited removal order, and coercing Mr. Crespo into signing the expedited removal paperwork even though the forms were not translated to him and contained numerous errors, because he understood it to be the only way he would avoid arrest, criminal prosecution, and deportation.

20

162.    Officer Reveruzzi had an ulterior motive or purpose in exercising such use and failing to abide by governing law.

163.    Officer Reveruzzi's perverted use of the expedited removal process resulted in Mr. Crespo's damages outlined above.

164.    After initiating the reinstatement process, the CBP employees referenced above perverted use of that process, including by failing to refer Mr. Crespo to an asylum officer even though the CBP employees understood from Mr. Crespo that he was afraid to return to Mexico and by dissuading him from pursuing a protection claim through the use of false or misleading statements.

165.    CBP's actions constituted the tort of abuse of process under the laws of the State of Texas.

166.    Under the FTCA, Defendant United States of America is liable for these actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

a.    Trial by judge;

b.    Entry of judgment for Plaintiff and against Defendant on Plaintiff's claims for relief;

c.    Compensatory damages in an amount to be proven at trial;

d.    Costs and reasonable attorney fees as provided by 28 U.S.C. § 2412 or any other provision of law; and

e.    Such other relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED, in Miami, Florida, this 7th day of June, 2018,

<u>s/ Brett Barfield</u>
Brett A. Barfield, (FBN 192252)
Benjamin J. Tyler, (FBN 1003552)
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 789-7661
Facsimile: (305) 789-7799
Email: brett.barfield@hklaw.com
Email: benjamin.tyler@hklaw.com

Trina Realmuto*
Kristin Macleod-Ball*
American Immigration Council
100 Summer Street, 23rd Floor
Boston, MA 02110
Telephone: (857) 305-3600
Email: trealmuto@immcouncil.org
Email: kmacleod-ball@immcouncil.org

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
  & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Telephone: (215) 925-4400
Email: jfeinberg@krlawphila.com

Matt Adams*
Northwest Immigrant Rights Project
615 2nd Avenue, Suite 400
Seattle, WA 98104
Telephone: (206) 957-8611
Email: matt@nwirp.org

*Attorneys for Plaintiff Jose Crespo-Cagnant*

* Applications for *pro hac vice* admission forthcoming